AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

> **FILED**
>
> **Jan 28, 2025**
>
> CLERK, U.S. DISTRICT COURT
> EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  2:25-mj-0016 CKD |
| KEVIN PARKER, JOHN PARKER, | ) | |
| VERONICA BROOKS, XAVIER SURITA, | ) | **REDACTED** |
| MARCELINO ESCOBAR, and DEVON NELSON, | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ (see below) _____ in the county of _____ Sacramento _____ in the _____ Eastern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Count 1 - 21 U.S.C. § 841(1)(1) | Distribution of at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, on or about September 18, 2024 (KEVIN PARKER and SURITA) |
| Count 2 - 21 U.S.C. § 841(a)(1); | Distribution of at least 40 grams of a mixture and substance containing a detectable amount of fentanyl, on or about March 8, 2024 (JOHN PARKER); |
| Count 3 - 21 U.S.C. § 841(a)(1); | Distribution of at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, or about August 1, 2024, in violation of 21 U.S.C. § 841(a)(1) (BROOKS); |
| Count 4 - 21 U.S.C. §§ 846, 841(a)(1); | Conspiracy to distribute and possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, on or about January 7, 2025 (M. ESCOBAR); |
| Count 5 - 21 U.S.C. § 841(a)(1). | Distribution of at least 400 grams of a mixture and substance containing a detectable amount of fentanyl, on or about June 12, 2024 (NELSON). |

This criminal complaint is based on these facts:
See attached Affidavit
☒ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Thomas Wiebold, DEA Special Agent
*Printed name and title*

Sworn to me and signed via telephone.

Date: _____ January 24, 2025 at 1:15 pm _____

_____
*Judge's signature*

City and state: _____ Sacramento, California _____

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF DEA SPECIAL AGENT THOMAS WIEBOLD

I, Thomas Wiebold, being first duly sworn, hereby depose and state as follows:

### I.        PURPOSE

1.        I make this affidavit in support of a Criminal Complaint charging the following people with the following crimes, and for arrest warrants for each of the following people:

        a)        Kevin PARKER and Xavier SURITA with distribution of at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, on or about September 18, 2024, in violation of 21 U.S.C. § 841(a)(1) (Count One);

        b)        John PARKER with distribution of at least 40 grams of a mixture and substance containing a detectable amount of fentanyl, on or about March 8, 2024, in violation of 21 U.S.C. § 841(a)(1) (Count Two);

        c)        Veronica BROOKS with distribution of at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, or about August 1, 2024, in violation of 21 U.S.C. § 841(a)(1) (Count Three);

        d)        Marcelino ESCOBAR with conspiracy to distribute and possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, on or about January 7, 2025, in violation of 21 U.S.C. §§ 846, 841(a)(1) (Count Four); and

        e)        Devon NELSON with distribution of at least 400 grams of fentanyl, on or about June 12, 2024, in violation of 21 U.S.C. § 841(a)(1) (Count Five).

2.        I also make this affidavit in support of search warrants of the residential properties located in the Eastern District of California:

        a)        BROOKS' current residence, located at 4009 33rd St, Sacramento, CA ("**Target Residence 1**" or "**TR1**"), which is further described in **Attachment A-1**, for evidence of violations of 21 U.S.C. §§ 846, 841(a)(1), as further described in **Attachment B-1**;

        b)        A drug stash house, located at 3078 MLK Jr. Blvd, Sacramento, CA

1

("**Target Residence 2**" or "**TR2**"), which is further described in **Attachment A-2**, for evidence of violations of 21 U.S.C. §§ 846, 841(a)(1) and 18 U.S.C. § 922(a)(1)(A), as further described in **Attachment B-2**; and

   c)  M. ESCOBAR's current residence, located at 6413 Sun River Drive, Sacramento, CA ("**Target Residence 3**" or "**TR3**"), which is further described in **Attachment A-3**, for evidence of violations of 21 U.S.C. §§ 846, 841(a)(1) and 18 U.S.C. § 922(a)(1)(A), as further described in **Attachment B-2**.

   3.  I also make this affidavit in support of a warrant to search SURITA's residence, located at 6353 Misty Wood Way, Citrus Heights, CA ("**Target Residence 4**" or "**TR4**"), which is further described in **Attachment A-4**, for the purpose of locating and arresting SURITA.

   4.  I also make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41(c)(1) and (4) and under 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephones assigned call numbers (916) 533-6257 ("**Target Telephone 1**," or "**TT1**"), subscribed to BROOKS; and (916) 914-3215 ("**Target Telephone 3**," or "**TT3**"), subscribed to M. ESCOBAR. **TT1** is serviced by AT&T, a wireless telephone service provider headquartered at 11760 US HWY 1, Suite 300, North Palm Beach, FL 33408. **TT3** is serviced by T-Mobile, a wireless telephone service provider headquartered at 4 Silvan Way, Parsippany, NJ 07054. **TT1** and **TT3** are described in **Attachment A-5** and **A-7**, respectively, and the location information to be seized is described herein and in **Attachment B-3**. There is probable cause to believe that the information sought by the requested warrants for **TT1** and **TT3** will lead to evidence of violations of 21 U.S.C. §§ 846, 841(a)(1) and the location of a person to be arrested on this Criminal Complaint and requested arrest warrants.

   5.  I also make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41(c)(4) and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (916) 666-2278 ("**Target Telephone 2**," or "**TT2**"), used by SURITA; **TT2's** service provider is Verizon, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, NJ

07921.  **TT2** is described in **Attachment A-6**, and the location information to be seized is described herein and in **Attachment B-3**.  There is probable cause to believe that the information sought by the requested warrant for **TT2** will lead to the location of a person to be arrested (SURITA) on the arrest warrant requested with this application for Criminal Complaint.

6.     This Court has jurisdiction to issue the proposed location information warrants related to the **Target Telephones** because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is within the Eastern District Court of California and has jurisdiction over the offenses being investigated.  *See* 18 U.S.C. § 2711(3)(A)(I).

## II.     AGENT BACKGROUND

7.     I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), and have been since April 2022.  I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.  I am authorized pursuant to Federal Rule of Criminal Procedure Rule 41(a)(2)(C) to request a search warrant.

8.     I am a graduate of the seventeen-week DEA Basic Agent Training Academy in Quantico, Virginia.  This training included instruction in the investigation of illicit drug trafficking, including, but not limited to, investigating criminal violations of 21 U.S.C. §§ 841 and 846.  I have received comprehensive, formalized instruction in drug identification, detection, and interdiction, financial investigations and money laundering, informant handling, law classes, report writing, seizure and forfeiture of drug-related assets, undercover operations, and electronic and physical surveillance procedures.  In furtherance of my training as a Special Agent, I have also received specialized instruction in cyber/dark net investigations, financial investigations, illicit hazardous environments/drug manufacturing laboratories, high-risk warrant service, Title III wire intercepts, license plate recognition technology, informant management, drug cartel culture, narcoterrorism, cryptocurrency, and cell phone digital evidence. My post-academy education in drug investigations totals over 290 hours of specialized training.

9.      The facts and information set forth herein are based upon my personal knowledge and observations, observations of other law enforcement personnel, observations of cooperating individuals as related to me and other law enforcement personnel, my review of investigative reports, and discussions with other federal, state, and local law enforcement officials.  Where I describe statements made by other people (including other agents and law enforcement officers), the statements are described in sum, substance, and relevant part.  Similarly, where I describe information contained in reports and other documents or records in this affidavit, this information is also described in sum, substance, and relevant part.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### III.      FACTS IN SUPPORT OF PROBABLE CAUSE

10.     The Sacramento DEA, in partnership with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), has been investigating Kevin PARKER, John PARKER, Veronica BROOKS, Xavier SURITA, Devon NELSON, Raymundo ESCOBAR, and Marcelino ESCOBAR, and other known and unknown individuals for distributing controlled substances and firearms in the Eastern District of California.  As described in this affidavit, this investigation included communications with and controlled purchases from Delvonta FIELDS, whom K. PARKER sourced with the drugs and firearms that were sold to law enforcement on multiple occasions.  FIELDS is now deceased.[1]  In this investigation, law enforcement used a confidential source ("CS") to conduct controlled purchases of drugs and firearms.[2]  Neither K. PARKER, M.

---

[1] *Reference* Sacramento County coroner case 24-03379.  *See* Elise Fischer, *One man killed, one wounded in double shooting along midtown Sacramento street, police say* (July 24, 2024),  https://www.sacbee.com/news/local/crime/article290262784.html.

[2] ███████████████████████████████████████████████

ESCOBAR, R. ESCOBAR, nor any other targets herein are licensed to deal in firearms.

A.    **Overview of Targets**

11.    Throughout this investigation, I have identified the following individuals to be involved in the trafficking of drugs and/or firearms as further detailed later in the affidavit:

12.    Kevin PARKER is a high-ranking member of the Oak Park Bloods gang who distributes firearms and controlled substances.

a)    In this investigation, K. PARKER sold methamphetamine, fentanyl, heroin, and 12 firearms to law enforcement.

b)    K. PARKER was previously convicted of the following crimes punishable by more than one year in prison: robbery, in violation of Cal. Penal Code (PC) § 211, on or about January 29, 2006, in Sacramento County, CA; felon in possession of a firearm, in violation of Cal. PC § 12021(A)(1), on or about June 17, 2007, in Sacramento County, CA; and felon in possession of ammunition, in violation of CA PC 30305(A)(1), on or about March 21, 2014, in Sacramento County, CA. K. PARKER is currently incarcerated at Sacramento County Jail, charged with attempted murder, in violation of Cal. PC § 664/187.

13.    John PARKER is high-ranking Oak Park Bloods gang member with a long criminal history involving drug trafficking.

a)    In this investigation, J. PARKER sold powder fentanyl to law enforcement on multiple occasions.

b)    J. PARKER was previously convicted of inflict corporal injury on a spouse/cohabitant, in violation of Cal. PC § 273.5(A), on or about December 23, 1999, in San Luis Obispo County, CA; arson on a property, in violation of Cal. PC § 451(D), on or about August 2, 2001, in Sacramento County, CA; transportation/sale of controlled substances, in violation of Cal. Health and Safety (HS) Code § 11352(A), on or about October 3, 2001, in Sacramento County, CA; possession/purchase cocaine base for sale,

in violation of Cal. HS § 11351.5 and evading peace officer: disregard safety, in violation
of Cal. Vehicle Code (VC) § 2800.2(A), on or about August 16, 2004, in Sacramento
County, CA; false imprisonment: violence/etc., in violation of Cal. PC § 237(A), on or
about March 11, 2010, in San Luis Obispo County, CA; felon in possession of a firearm,
in violation of Cal. PC § 12021(A)(1), on or about June 17, 2010, in Sacramento County,
CA; possession of controlled substances while armed, in violation of Cal. HS § 11370.1,
and evading peace officer: disregard safety, in violation of Cal. VC § 2800.2(A), on or
about December 22, 2016, in Sacramento County, CA.

14.     Veronica BROOKS directly sold approximately two pounds of methamphetamine
and multiple smaller quantities of cocaine to law enforcement through a series of controlled
purchases.  BROOKS allowed known Oak Park Bloods gang members to conduct drug deals
inside her residence on multiple occasions during this investigation.

        a)      BROOKS was previously convicted of transport/sell controlled
substances, in violation of Cal. HS § 11352(A), on or about April 4, 2012, in Sacramento
County, CA.

        b)      BROOKS lives at **Target Residence 1** and utilizes **TT1**.

15.     Xavier SURITA is a methamphetamine and fentanyl dealer who sourced drugs for
K. PARKER to further distribute to the CS in this investigation.

        a)      SURITA was previously convicted of take vehicle without consent/vehicle
theft, in violation of Cal. VC § 10851(A), on or about May 20, 2008, in Sacramento
County, CA; take vehicle without consent/vehicle theft, in violation of CA VC 10851(A),
and possession of controlled substance, in violation of Cal. HS § 11377(A), on or about
August 12, 2008, in Sacramento County, CA; possession of controlled substance for sale,
in violation of Cal. HS § 11378, on or about March 11, 2011, in Sacramento County, CA;
possession of controlled substance, in violation of Cal. HS § 11377(A), on or about July
10, 2012, in Sacramento County, CA; possess controlled substance while armed, in
violation of Cal. HS § 11370.1(A), on or about December 9, 2017, in Sacramento

County, CA; and possession of controlled substance/etc. in prison/etc., in violation of Cal. PC § 4573.6, on or about January 11, 2018, in San Joaquin County, CA.

      b)    There is probable cause to believe that SURITA lives at **Target Residence 4** and utilizes **TT2**.

16.    Devon NELSON is a validated Oak Park Bloods gang member who sold law enforcement approximately 4,000 fentanyl pills in this investigation.

      a)    NELSON has previously been convicted of assault with firearm on a person, in violation of Cal. PC § 245(A)(2), on or about September 28, 2010, in Sacramento County, CA; and felon in possession of ammunition, in violation of Cal. PC § 30305(A)(1), on or about October 7, 2021, in Sacramento County, CA.

      b)    NELSON is currently on pre-trial release for a pending Sacramento County criminal case, in which he has been charged with resisting/obstructing public/peace officer, a felony violation of Cal. PC § 148(a)(1).

17.    Raymundo ESCOBAR was identified in this investigation as one of K. PARKER's firearm and methamphetamine sources. For his participation in this investigation, R. ESCOBAR was charged by Criminal Complaint in EDCA Case No. 2:25-mj-0005 with distribution of methamphetamine. Thus, while I have included facts about R. ESCOBAR's criminal conduct in this affidavit as it relates to K. PARKER and M. ESCOBAR's conspiracy with R. ESCOBAR to distribute controlled substances and firearms, as well as the probable cause to search **TR3**, I am not seeking a Complaint charging R. ESCOBAR at this time.

18.    Marcelino ESCOBAR is the biological brother of R. ESCOBAR and was involved in sourcing methamphetamine and firearms to K. PARKER.

      a)    I am not aware of any prior convictions for M. ESCOBAR.

      b)    I have found M. ESCOBAR to be associated with **Target Residence 3** and utilize **TT3** during this investigation.

**B.**    **Background of Investigation into K. PARKER and his Associates**

19.    Beginning in September 2023, the CS began communicating with a person that

law enforcement identified as Delvonta FIELDS, who the CS initially met at the Sacramento County Probation Office.  During the CS's interactions with FIELDS, FIELDS told the CS that he had marijuana for sale, and also provided a cell phone number for the CS to contact FIELDS. Agents and detectives escorted the CS to and from the meeting, and also physically observed the CS's two meetings with FIELDS at the Probation Office; however, the interactions were not recorded with audio or video recording equipment.

20.     For each of the following controlled purchases described in this affidavit, the phone calls and text messages between the CS and the targets of this investigation were recorded and preserved by law enforcement.  The CS was escorted by agents to and from each transaction location.  During each transaction, the CS was equipped with covert recording equipment, which captured an audio and/or video recording of the CS's interactions.  These recordings were later preserved by law enforcement.  Additionally, before and after each controlled purchase, agents searched the CS and the Undercover Vehicle ("UCV") used by the CS for contraband.  None was ever located.  Following each controlled purchase, law enforcement immediately took custody of the acquired contraband.

21.     On November 16, 2023, the CS conducted a recorded controlled purchase of approximately three ounces of marijuana from FIELDS at a Motel 6 room in Sacramento, CA. During the transaction, the CS also purchased 0.723 grams of powder fentanyl from FIELDS, who had obtained it from an unidentified black female who was also inside the motel room. Chemists at the DEA lab later confirmed the weight and presence of fentanyl, but the marijuana was not tested.

22.     On November 21, 2023, the CS conducted a recorded controlled purchase of approximately three ounces of marijuana and 5.844 grams of powder fentanyl from FIELDS at 4059 4th Avenue, Sacramento, CA.[3]  Chemists at the DEA lab later confirmed the weight and

---

[3] A law enforcement query to the Sacramento Municipal Utilities District (SMUD) identified that the customer for the utilities at this residence is John Dantzler, who has been the customer since August 2023.  SMUD provided Dantzler's phone number as 916-980-0374. Based on my training and experience, I know that drug dealers often conduct their illicit business (in this case, the storage/and or distribution of controlled substances) at locations other than their

presence of fentanyl, but the marijuana was not tested.  During the controlled purchase, FIELDS

referred to 4059 4th Avenue as "the spot."  Based on my training and experience, and my

knowledge of drug slang, I believe that in this context "the spot" is a reference to 4059 4th

Avenue as a stash house for contraband.  After this initial controlled purchase, the CS gained

access to FIELDS' associates, including J. PARKER and BROOKS, and eventually K.

PARKER, SURITA, NELSON, R. ESCOBAR, and M. ESCOBAR.

     **C.**     **February 15, 2024 Controlled Purchase of Fentanyl from J. PARKER**

     23.     On February 15, 2024, at the direction of law enforcement and due to multiple

unanswered calls from FIELDS, the CS went to 4059 4th Avenue to attempt to regain contact.

The CS knocked on the door and no one answered at first.  The CS left the residence while

surveillance agents maintained observation of the area.  Approximately 30 minutes later, agents

saw a white Audi A5 arrive, bearing CA license plate 8SRC951.[4]  A black male exited and

proceeded into the residence.  Agents then directed the CS to again approach and knock on the

door.

     24.     This time, the door was answered by an individual who law enforcement later

identified as John PARKER by comparing the video recording, which captured J. PARKER's

face, to a Sacramento County booking photo:



        COVERT RECORDER        BOOKING PHOTO

---

primary residences in order to avoid detection by law enforcement.

    [4] A CA DMV query identified that the white Audi A5, CA LP 8SRC951, was registered
to Brittney Cooper at 2924 Flora Springs Way, Sacramento, CA.  I know based on my training
and experience that individuals who sell drugs may drive vehicles that are not registered in their
name, or to their address, in order to avoid detection by law enforcement.

25.     The CS asked to buy drugs from J. PARKER, and J. PARKER let the CS into the residence.  J. PARKER called to FIELDS to discuss the CS's request to purchase drugs.  Based on my training and experience, I believe that J. PARKER was validating that the CS's information was true.  I know that drug dealers and gang members often validate customers by asking other trusted members, in order to avoid inadvertently selling drugs to law enforcement.  During the conversation, J. PARKER allowed the CS to talk to FIELDS on J. PARKER's phone, and the three parties agreed that J. PARKER would sell fentanyl to the CS.  Later, when asked the CS asked for J. PARKER's name, J. PARKER self-identified as "Ghost" and provided the CS with phone number 916-604-1286[5] as his contact number.

26.     During the interaction, J. PARKER sold 6.227 grams of fentanyl to the CS.  Chemists at the DEA lab later confirmed the weight and presence of fentanyl.

**D.     February 20, 2024 Controlled Purchase of Fentanyl, Cocaine, and a Firearm from J. PARKER and FIELDS**

27.     In the days following the February 15, 2024 controlled purchase, at the direction of law enforcement, the CS arranged with FIELDS to purchase a .45 caliber pistol and approximately half an ounce of powder fentanyl.  The CS and FIELDS agreed to meet on February 20th, 2024, at 4059 4th Avenue.

28.     The CS saw another identified individual open the front door of 4059 4th Avenue and walk inside.  The CS then approached the front door and was greeted by J. PARKER, who allowed the CS into 4059 4th Avenue.  Other individuals were present; one self-identified as a member of the Oak Park Bloods gang.  The CS told J. PARKER that FIELDS had told the CS that he was en route to 4059 4th Avenue.  J. PARKER called FIELDS and told FIELDS the information that the CS provided.  Based on my training and experience, I believe that J. PARKER also called FIELDS to verify that the information provided by the CS was true.

[5] An administrative subpoena served to T-Mobile identified that this phone number is subscribed to Jahidi Jahidi at 2237 Hurley Way, Sacramento, CA.  A Google Maps query identified that this address is an apartment building; however, the subscriber information does not provide a specific apartment number for the subscriber.  I know based on my training and experience that individuals engaged in criminal activities use phones and phone numbers that are not subscribed to their name or address in order to avoid detection by law enforcement.

29.    The CS asked to buy half an ounce of powder fentanyl from J. PARKER, who said that he had fentanyl and would charge $350 for it.  The CS then observed J. PARKER preparing the fentanyl in the kitchen.  Later, J. PARKER provided the CS with a baggie containing powder fentanyl, which the CS paid for with government-furnished funds.

30.    J. PARKER later asked the CS how much fentanyl the CS intended to purchase from FIELDS.  The CS explained that he/she intended to purchase approximately half an ounce of powder fentanyl from FIELDS, as well as a firearm.  J. PARKER then told the CS that he would provide the half ounce of powder fentanyl to the CS on behalf of FIELDS, and would collect the payment.  J. PARKER indicated that FIELDS charged $500 for a half ounce of powder fentanyl.  Based on my training and experience, I know that drug traffickers vary the prices they charge to customers for a variety of reasons.  One of these reasons is that dealers who are lower in the distribution chain charge more money for drugs to their customers because the dealer must then provide a portion of the received payment to their own dealer (often referred to as a "tax").  For this reason, I believe that the quoted price of $500 for the half ounce of powder fentanyl from FIELDS, as opposed to the $350 for the half ounce of powder fentanyl from J. PARKER, was indicative that FIELDS charged more for the drugs because his position within the DTO was lower than J. PARKER's.

31.    J. PARKER proceeded into the kitchen, where he transferred approximately half an ounce of powder fentanyl from one baggie to another.  J. PARKER provided this baggie to the CS in exchange for $500 in government-furnished funds, which the CS gave to J. PARKER:



J. PARKER PACKAGING FENTANYL

32.     Shortly thereafter, surveilling law enforcement officers saw FIELDS in a black Honda CR-V, CA LP 8ZAP421,[6] arrive to the residence and park behind a red Mercedes ML320, CA LP 4KCM155,[7] which was parked in the driveway (FIELDS later moved the black Honda CR-V, explaining to the CS that it was blocking J. PARKER's red Mercedes ML320). FIELDS exited the vehicle and entered 4059 4th Avenue carrying a bundled jacket.  Upon entering, FIELDS placed the bundled jacket on a couch.  Later, FIELDS showed the CS the firearm for sale on the couch, and the CS bought the firearm in exchange for $1000 in government-furnished funds.

33.     The CS then departed 4059 4th Avenue, escorted by agents to a predetermined location where the CS provided the purchased drugs and firearm to law enforcement.  Chemists at the DEA lab later confirmed that the suspected fentanyl purchased from J. PARKER was in fact 23.9 grams of powder fentanyl.

**E.     March 7, 2024 Controlled Purchase of Fentanyl from J. PARKER**

34.     On March 6, 2024, at the direction of law enforcement, the CS communicated with J. PARKER and arranged to purchase eight ounces of powder fentanyl from him.  The following day, on March 7, 2024, law enforcement escorted the CS to 4059 4th Avenue, where the CS had agreed to meet with J. PARKER for the transaction.  When the CS arrived, J. PARKER was not at the residence.  Eventually, J. PARKER arrived as the passenger of a red Porsche Cayenne, CA LP 7DME946.[8]  Both J. PARKER, and the driver of the red Porsche Cayenne (an unidentified black female) proceeded into 4059 4th Avenue, with the CS following.

[6] A CA DMV query identified that the black Honda CR-V, CA LP 8ZAP421, was registered to Rafik Bagdikyan at 3620 Bainbridge Drive, North Highlands, CA.  I know based on my training and experience that individuals who sell drugs may drive vehicles that are not registered in their name, or to their address, in order to avoid detection by law enforcement.

[7] A CA DMV query identified that the red Mercedes ML320, CA LP 4KCM155, was registered to West Coast Auto Dismantling at 333 North Pioneer Avenue, Woodland, CA.  I know based on my training and experience that individuals who sell drugs may drive vehicles that are not registered in their name, or to their address, in order to avoid detection by law enforcement.

[8] A CA DMV query identified that the red Porsche Cayenne, CA LP 7DME946, was registered to Simone Mitchell at 4681 Baywind Drive, Sacramento, CA.  Law enforcement was unable to confirm if Mitchell was the driver of the vehicle during the operation.

An unidentified black male was already inside the residence.

35.     In the kitchen, the CS's covert recording equipment captured J. PARKER with multiple baggies of a white powdery substance:



J. PARKER PACKAGING FENTANYL

36.     The CS then purchased approximately 2.5 ounces of powder fentanyl from J. PARKER, which J. PARKER stated was all the fentanyl he had available to sell at that time. The CS also asked about buying more fentanyl, and J. PARKER indicated that he would have more fentanyl available the following day.

37.     Following the purchase, the CS departed and was escorted away from the area by law enforcement, who took custody of the drugs.  Chemists at the DEA lab later confirmed the weight (59.4 grams) and presence of fentanyl.

**F.    March 8, 2024 Controlled Purchase of Fentanyl from J. PARKER *(Count Two)***

38.     The following morning, J. PARKER called the CS and said that he had four more ounces of powder fentanyl.  Later that day, CS returned to 4059 4th Avenue and purchased the additional fentanyl from J. PARKER.  Again, J. PARKER prepared the fentanyl in the kitchen and then sold approximately four ounces of the drug to the CS.  Below is a still image from a

recording of J. PARKER preparing the fentanyl powder:



J. PARKER WEIGHING FENTANYL

39.    When asked, J. PARKER indicated that he would have more fentanyl available the following week.  Following the controlled purchase, the CS departed 4059 4th Avenue and was escorted away by law enforcement.  Chemists at the DEA lab later confirmed the weight (99.0 grams) and presence of fentanyl in the purchased drugs.

**G.    April 2, 2024 Controlled Purchase of Methamphetamine, Fentanyl, a Firearm, and Cocaine from K. PARKER and BROOKS**

40.    On April 1, 2024, the CS arranged to buy a firearm, approximately four ounces of powder fentanyl, and approximately one pound of crystal methamphetamine from FIELDS.  The following day, on April 2, 2024, FIELDS texted the CS the address 4009 33rd Street, Sacramento, CA[9] (**TR1**), to meet for the transaction.

41.    Prior to escorting the CS to **TR1**, law enforcement established surveillance in the vicinity and observed FIELDS arrive as the passenger in a silver Dodge Charger, CA LP P224L0, and enter the residence.  Shortly thereafter, the CS arrived and proceeded into the residence after FIELDS.  Inside, the CS met with FIELDS, and a black female later identified as

---

[9] A law enforcement SMUD query identified that the customer for the utilities at this residence is Veronica BROOKS, who has been the customer since July 2023.  SMUD provided BROOKS's phone number as 916-533-6257 (**TT1**).

Veronica BROOKS by comparing images from the covert video recorder to Sacramento County booking photos and her CA Driver's License, as well as by examining utilities customer information and Sacramento Police Department CAD call logs associated with **TR1** and BROOKS.

42.     Inside the residence, FIELDS explained that both the powder fentanyl and the crystal methamphetamine that the CS had ordered were "coming right now."  Based on my training and experience, and as previously stated, I assess that FIELDS's position within the DTO was such that he did not readily have this large quantity of drugs available to him, and thus had to request that someone who ranked higher within the DTO to bring the drugs.  While previously the CS was able to purchase gram quantities of powder fentanyl, and ounce quantities of marijuana, I believe that FIELDS did not have access to multiple-ounce quantities of powder fentanyl and pound-quantities of methamphetamine.  The CS explained to FIELDS that the CS would provide additional funds to FIELDS, on top of the payment for the drugs, for facilitating the transaction.

43.     While still waiting for the powder fentanyl and crystal methamphetamine to arrive, the CS asked BROOKS to purchase marijuana from her.  BROOKS agreed, and provided the CS with approximately four ounces of marijuana in exchange for government-furnished funds.  BROOKS also offered approximately one gram of ecstasy and approximately two grams of cocaine in exchange for government-furnished funds.  BROOKS also provided the CS with her phone number, 916-533-6257[10] (**TT1**).

44.     A short while later, a black Toyota Tacoma, CA LP 76265S3[11] arrived, and

---

[10] An administrative subpoena served to AT&T identified that the user of **TT1** is Veronica BROOKS at **TR1**.

[11] A CA DMV query identified that the black Toyota Tacoma, CA LP 76265S3, was registered to PV Holdings and was an Avis rental vehicle.  A law enforcement request to Avis identified that the vehicle had been rented by Laura Parker.  The Sacramento County WebKPF listed Laura Parker, a.k.a. Laura Garza, as a frequent visitor to K. PARKER while K. PARKER was incarcerated at Sacramento County Jail.  I know based on my training and experience that those involved in criminal activities will drive vehicles not registered in their name or to their address, to include using rental vehicles, in order to avoid detection by law enforcement.

surveillance units observed an individual later identified as Kevin PARKER (the brother of J. PARKER) exit the vehicle and enter **TR1**. K. PARKER was identified by comparing images from the covert recorder to Sacramento County booking photos and his CA Driver's license. Additionally, K. PARKER self-identified to the CS as "KP." The moniker "KP" is listed on the Sacramento County WebKPF database as a moniker for K. PARKER. K. PARKER is also identified in WebKPF as a validated member of the Oak Park Bloods criminal street gang.

45.    Inside **TR1**, K. PARKER placed a bag containing powder fentanyl, a bag containing crystal methamphetamine, and a firearm on a dining room table. The CS then provided K. PARKER with government-furnished funds for the powder fentanyl, methamphetamine, and firearm. K. PARKER told the CS, "I got all types of shit." Based on my training and experience, I believe that K. PARKER was explaining to the CS that he was able to obtain a variety of controlled substances, as well as firearms, which he could sell to the CS. K. PARKER told the CS that he had other people available to "pull up" to the CS if FIELDS was not available. Based on my training and experience, I know that "pull up" means to meet with a customer to conduct a transaction on behalf or in place of an associate. K. PARKER also told the CS that the CS could contact BROOKS, who in turn could contact K. PARKER.

46.    Based on my training and experience, I know that drug and firearms dealers, particularly those who supply other dealers (often referred to as a "source of supply" or "SOS") attempt to limit contact with customers in order to insulate themselves from potential exposure to law enforcement. For this reason, it is my belief that K. PARKER was a SOS for FIELDS, and was at that time unwilling to deal with the CS directly, instead intending to have the CS communicate and order drugs through a proxy or intermediary, such as FIELDS or BROOKS. In this way, K. PARKER was able to keep the CS as a customer while also maintaining a buffer of association between himself and the CS in order to avoid detection by law enforcement.

47.    After the transaction, the CS departed and was escorted away from the residence by law enforcement. Chemists at the DEA lab later confirmed the weight and presence of drugs: 96.5 grams of powder fentanyl (cocaine was also identified in this substance) and 446 grams of

methamphetamine from K. PARKER, and 1.7 grams of cocaine from BROOKS. The approximate 4 ounces of suspected marijuana, and small amount of suspected ecstasy from BROOKS were not tested. The firearm, a Colt MK IV Series 80 Mustang .380-caliber pistol, bore serial number RC91679.

**H.**      **April 23, 2024 Controlled Purchase of Methamphetamine and Cocaine from K. PARKER and BROOKS**

48.      After the April 2, 2024 controlled purchase, the CS continued to communicate telephonically with FIELDS. At the direction of law enforcement, the CS requested to purchase two pounds of crystal methamphetamine, and the CS and FIELDS agreed to meet on April 23, 2024 at **TR1**.

49.      Law enforcement escorted the CS to **TR1**, where FIELDS and K. PARKER were observed standing outside of the residence. Upon the CS's arrival, FIELDS, K. PARKER, and the CS entered the residence. FIELDS was carrying a bag which bore a San Francisco 49ers logo. Once inside, K. PARKER removed some T-shirts from the 49ers bag, revealing a plastic bag containing approximately two pounds of suspected methamphetamine. The CS provided government-furnished funds to pay for the methamphetamine, and also provided government-furnished funds to FIELDS for facilitating the transaction.

50.      After providing the funds, the CS asked K. PARKER if he was involved in recording music. I know, based on my training and experience and familiarization with the Oak Park Bloods criminal street gang, that recording music is a revenue-generating enterprise that some members pursue. I also know that Timothy PATTERSON a.k.a. "Mozzy" is a mainstream rap artist (his Instagram handle, @mozzy, boasts 1.5 million followers) and is also a validated Oak Park Bloods gang member. I know that FIELDS was an associate of PATTERSON and was also involved in recording music under the moniker "Uzzy Snubbz." However, K. PARKER responded to the CS by stating, "I don't be in the studio, I be trapping." Based on my training and experience, I know that "trapping" is the act of selling contraband as a means of accumulating wealth. Therefore, based on this statement, it is my belief that K. PARKER's

primary role within the criminal organization, is to sell controlled substances and firearms to generate income.

51.     Later, BROOKS provided the CS with a small quantity of cocaine, which the CS purchased with government-furnished funds.

52.     During the interaction, the CS told K. PARKER that the CS was interested in purchasing both methamphetamine and powder fentanyl in the future, and also asked about more "get downs," which is a slang reference to firearms.  K. PARKER explained that he would have to call and/or "pull up," or meet with his SOS to confirm the availability.  Based on my training and experience, I know that sometimes drug dealers acquire different drugs from different sources of supply.  For example, one SOS may provide methamphetamine, but another SOS may provide powder fentanyl, and still another may provide firearms.

53.     The CS then departed **TR1**, escorted by law enforcement, who later took custody of the contraband.  Chemists at the DEA lab later confirmed the weight and presence of drugs: 899 grams of methamphetamine from K. PARKER and 1.8 grams of cocaine from BROOKS.

I.     **May 14, 2024 Controlled Purchase of Crystal Methamphetamine from FIELDS at TR2 involving SURITA and K. PARKER**

54.     On April 26, 2024, the CS purchased approximately two pounds of methamphetamine and a firearm from FIELDS, who was observed meeting with K. PARKER immediately after the transaction.

55.     After April 26, 2024, at the direction of law enforcement, the CS communicated telephonically with FIELDS to purchase two pounds of methamphetamine on May 14, 2024.

56.     Before the transaction, FIELDS instructed the CS to meet in the vicinity of 5th Avenue and 37th Street, Sacramento, CA.  Once the CS was escorted to this location by law enforcement, the CS met FIELDS and a black female later identified as Ckayzia McClellan[12], based on comparing the covert video recording of McClellan with Sacramento County WebKPF booking photos.  FIELDS instructed the CS to follow him, and they drove in tandem until

_____

[12] McClellan was later arrested by Sacramento Police Department and charged with, among other crimes, assault with firearm on a person, in violation of Cal. PC § 245(A)(2).

eventually stopping at 3078 Martin Luther King Jr. Boulevard[13] (**TR2**).  Once at the residence,
FIELDS explained to the CS that FIELDS would go inside the residence to retrieve the drugs.
Upon the CS providing FIELDS the government-furnished funds, FIELDS was observed
entering the front yard area of **TR2**.  Shortly thereafter, FIELDS returned to the CS with a bag
containing approximately two pounds of crystal methamphetamine.  FIELDS told the CS that the
drugs were from the "same one, he getting a haircut right now."  In context and based on my
training and experience, I believe that when FIELDS said "same one," FIELDS was explaining
to the CS that the drugs were sourced by K. PARKER—the same SOS from the prior deal.

57.     After receiving the drugs (which chemists at the DEA lab later confirmed to be
911 grams of methamphetamine), the CS inquired about the possibility of acquiring two
additional pounds of crystal methamphetamine.  FIELDS then re-entered **TR2**, and after a short
period of time, returned to the CS and explained that the CS could purchase the two additional
pounds of crystal methamphetamine in approximately 30-45 minutes.  Based on my training and
experience, I believe that FIELDS entered the residence to talk to K. PARKER, because K.
PARKER is FIELD's methamphetamine SOS.

58.     About 15 minutes later, surveillance units saw two individuals leave the area of
**TR2** in a grey Ford Edge, CA LP 9FID963, which drove to 1513 Grace Avenue, Sacramento,
CA.[14]  Law enforcement identified the driver of the grey Ford Edge as SURITA by comparing
his appearance during surveillance to his Sacramento County jail booking photos.  California
DMV records showed that the vehicle was registered to PV Holdings and was an Avis rental
vehicle.  In response to a law enforcement query, Avis confirmed that the vehicle had been
rented by Xavier SURITA.  Law enforcement also found an additional photo of SURITA on his

---

[13] A Sacramento County WebKPF query identified that Maurice COLLINS resided at
3078 Martin Luther King Jr. Boulevard, and has since approximately May 2021.  COLLINS, per
WebKPF, is a validated Oak Park Bloods gang member.  A SMUD query also identified that
COLLINS is the utilities customer at **TR2**.

[14] Federal search and arrest warrants were later conducted at this residence (*Reference*
Case # 2:24-mj-00098-AC and USDC District of Maryland Case # 1:24-mj-2035-ADC). Alexis
BUSTOS was arrested and charged with violating 21 U.S.C. 846 – Conspiracy to distribute
methamphetamine.

paramour, Sarina Razo's, Facebook account, which matched the booking photos and further confirmed that the person driving the vehicle was SURITA.

59.     At 1513 Grace Avenue, an individual approached the grey Ford Edge and handed a bag to the occupants.  Then the vehicle drove back to **TR2**.  At that time, SURITA and an unidentified passenger approached K. PARKER's gray GMC Envoy (CA LP 5CKY379).  The unidentified passenger opened the rear passenger door of K. PARKER's GMC Envoy.

60.     Based on my training and experience, I believe that, at 1513 Grace Avenue, SURITA and the unknown passenger received the two pounds of crystal methamphetamine. They then transported the drugs back to **TR2**, where the passenger provided the drugs to K. PARKER by placing the drugs in his vehicle.

61.     Shortly thereafter, FIELDS approached the CS, and the CS paid for the drugs, as well as additional government-furnished funds to pay FIELDS for coordinating the transaction. FIELDS then walked back to the passenger side of K. PARKER's GMC Envoy, and then returned to the CS with a bag containing approximately two pounds of methamphetamine, which he provided to the CS.  The CS then departed the area, escorted by law enforcement.

62.     Chemists at the DEA lab later confirmed the that the purchased drugs from this transaction were 928 grams of methamphetamine.

**J.      May 29, 2024 Controlled Purchase of a Firearm and Methamphetamine from FIELDS at TR1 and TR2**

63.     On May 24, 2024, law enforcement purchased a firearm from FIELDS.

64.     After the May 24, 2024 controlled purchase, FIELDS called the CS and told the CS that methamphetamine was available for purchase.  At the direction of law enforcement, the CS told FIELDS that he would be able to purchase the methamphetamine on May 29, 2024. Prior to May 29, 2024, FIELDS again called the CS and said that he also had another firearm to sell.  The CS agreed to purchase the firearm along with the methamphetamine.  Later, FIELDS instructed the CS to meet at **TR1** for the firearm transaction.

65.     Law enforcement escorted the CS to **TR1**.  Outside of the residence were

FIELDS, BROOKS, and an unidentified black male.  When the CS parked, FIELDS entered the passenger seat of the CS's vehicle, took a pistol from his waistband, and sold it to the CS. FIELDS then told the CS to meet at **TR2**, where the drug transaction was to occur.  When FIELDS exited the CS's vehicle, he approached BROOKS, who had watched FIELDS with the CS during the transaction.  The CS then departed the area.  Surveilling law enforcement units and the CS noted that BROOKS was staring at FIELDS throughout the controlled purchase. Further, FIELDS said "she, she switched it," in reference to the firearm.  In context and based on my training and experience, I believe FIELDS was conveying that BROOKS wanted him to sell that particular firearm.  BROOKS is prohibited from possessing firearms because of her felony conviction history.

66.     As the CS arrived to **TR2**, FIELDS walked from the area of **TR2** and entered the passenger seat of the CS's vehicle.  Once inside, FIELDS removed a bag that was concealed in his waistband.  Inside the bag was approximately two pounds of methamphetamine, which the CS purchased with government-furnished funds.  The CS provided FIELDS additional government-furnished funds for coordinating the transaction.  The CS then departed the location, escorted by law enforcement.

67.     ATF later identified that the purchased firearm was a Privately Made Firearm (PMF) and was a Glock-type .40-caliber pistol with no manufacturer markings or serial number. It was also loaded with a high capacity magazine.  However, when ATF attempted to test-fire the weapon to conduct cartridge casings for analysis in the National Integrated Ballistic Information Network (NIBIN), the pistol did not fire.  ATF analyzed the firearm and determined that the firing pin was damaged and unable to strike the primer of the bullet.  ATF determined that the firing pin was inoperable, and that the firearm was inoperable.

68.     Chemists at the DEA lab later analyzed the purchased crystal methamphetamine and confirmed the weight (892 grams) and presence of methamphetamine.

/ / /

/ / /

**K.** **June 12, 2024 Controlled Purchase of Fentanyl Pills from FIELDS and NELSON** *(Count Five)*

69.      After the May 29, 2024 controlled purchase, the CS communicated telephonically with FIELDS.  At the direction of law enforcement, the CS requested to purchase methamphetamine and counterfeit oxycodone tablets laced with fentanyl.  FIELDS agreed to sell two pounds of methamphetamine and 4,000 tablets to the CS, and on June 12, 2024, FIELDS instructed the CS to meet at **TR1** for the transaction.

70.      The CS was escorted to **TR1** by law enforcement.  After parking, the CS entered the residence and met with FIELDS, BROOKS, and other unidentified individuals.  The CS provided BROOKS government-furnished funds for allowing the transaction to occur at her residence.  The CS also discussed purchasing marijuana and ounce-quantities of crack cocaine from BROOKS, who told the CS that she would introduce the CS to her crack cocaine "plug." Based on my training and experience, I know that a "plug" is a source of supply.

71.      FIELDS explained to the CS that they would have to meet with "blood," and that the individual wasn't "some random," but they would have to travel to a gas station in West Sacramento to conduct the transaction for the counterfeit oxycodone tablets.  Based on my training and experience, I know that by FIELDS explaining that "blood" wasn't "some random," he was explaining that the counterfeit oxycodone tablet SOS was a trusted gang and DTO member.  I believe that FIELDS was vouching for the credibility of the SOS so that the CS would feel comfortable traveling to West Sacramento to conduct the transaction.

72.      The CS, escorted by law enforcement, followed FIELDS to the Power Mart located at 3180 Jefferson Boulevard, West Sacramento.  At the Power Mart, surveillance detectives observed a red Mercedes circle the lot.  Shortly thereafter, an individual later identified as Devon NELSON by comparing surveillance photos to his Sacramento County booking photos, as well as later confirmation by ankle GPS coordinates,[15] approached the rear

---

[15] NELSON was on Pre-Trial Release through the Sacramento Couny Probation Office for resisting/obstructing a public/peace officer, in violation of Cal. PC § 148(A)(1).  An examination of NELSON's WebKPF information identified that he was a validated Oak Park

passenger window of the red Mercedes.  A surveillance detective observed a black male with short hair in the red Mercedes give NELSON multiple circular plastic bags.  Based on my training and experience, I know that counterfeit oxycodone tablets are often packaged in quantities of 1,000 pills, which are referred to as "boats."  Boats are often packaged in clear plastic bags that can appear circular when full.

73.     NELSON then walked to FIELDS's vehicle and entered.  Shortly thereafter, FIELDS exited his vehicle, walked to the CS's vehicle, and entered the passenger seat.  FIELDS told the CS, "I'm going to go grab it from him right there," and pointed in the direction of NELSON.  Based on my training and experience, I believe that FIELDS was referring to NELSON as the trusted fellow gang member and SOS that FIELDS had originally told the CS about.  The CS then provided FIELDS with government-furnished funds, which FIELDS took, exited the CS's vehicle, and returned to his own vehicle, where NELSON was still sitting.

74.     FIELDS returned to the CS's vehicle and produced four plastic bags containing approximately 1,000 pressed blue tablets per bag which he gave to the CS.  The CS also provided government-furnished funds to FIELDS for coordinating the transaction.

75.     Around the same time, surveillance detectives observed NELSON walk from FIELDS's vehicle back to the red Mercedes.

76.     FIELDS told the CS that the methamphetamine was not yet ready, so the CS then departed the area, escorted by law enforcement.

77.     Based on court authorized Pen Register Trap and Trace (PRTT) data for FIELDS's cell phone, law enforcement identified a high frequency of contacts with 916-559-0388.[16]  An examination of NELSON's WebKPF information identified this as NELSON's listed phone number.

78.     Chemists at the DEA lab later tested the drugs, and identified that they weighed

---

Bloods gang member.

[16] An administrative subpoena served to T-Mobile identified that the subscriber for the number was Mercedes Fisher at 9 Raindrop Court, Sacramento, CA.

433 grams and contained fentanyl.

**L.    Death of FIELDS, and August 1, 2024 Controlled Purchase of Methamphetamine from BROOKS *(Count Three)***

79.    On July 20, 2024, FIELDS was fatally shot and killed.

80.    In the aftermath of FIELD's death, and at the direction of law enforcement, the CS contacted BROOKS at **TT1**.  During the conversation, the CS requested to purchase methamphetamine from BROOKS.  BROOKS agreed, and instructed the CS to travel to **TR1** in order to conduct the transaction.

81.    Law enforcement escorted the CS to **TR1**.  Upon arrival, the CS entered the front door of **TR1** and met BROOKS.  The CS and BROOKS conversed about FIELDS while BROOKS closed and locked the front door.  Once the door was closed, BROOKS provided a bag containing the requested methamphetamine to the CS, which the CS inspected.

82.    The CS then provided government-furnished funds to BROOKS in exchange for the methamphetamine, as well as a small amount of cocaine and marijuana.  After receiving the drugs, the CS departed the area and was escorted away by law enforcement.

83.    Chemists at the DEA lab later confirmed that the purchased drugs were 891 grams of methamphetamine.

**M.    August 20, 2024 Controlled Purchase of Crystal Methamphetamine from K. PARKER**

84.    On August 15, 2024, without law enforcement involvement, the CS was at a restaurant where K. PARKER also happened to be.  K. PARKER invited the CS to talk, and gave his cell phone number so the CS could contact K. PARKER.  Following the interaction, the CS called law enforcement to debrief the unexpected encounter with K. PARKER, and explained that after the CS texted the phone number, K. PARKER would contact the CS from a different phone number.  The CS explained to law enforcement that K. PARKER's purpose for establishing contact with the CS was to continue the distribution of controlled substances to the CS.  At the direction of law enforcement, the CS contacted K. PARKER on the phone number he provided and the restaurant, and  K. PARKER responded from another number that, according to

Verizon, was subscribed to "Kevin Parker" at 3604 Ivy Street, Sacramento, CA.

85.     Between August 16, 2024, and August 20, 2024, at the direction of law enforcement, the CS communicated with K. PARKER to arrange to purchase approximately two pounds of methamphetamine from K. PARKER.  K. PARKER instructed the CS to meet at a Wendy's parking lot at 4180 Northgate Boulevard to conduct the transaction on August 20.

86.     Law enforcement escorted the CS to the Wendy's parking lot.  Once the CS arrived, the CS met with K. PARKER, who directed the CS into the back seat of a red Ford Edge, AZ LP CWT8560.

87.     While the CS was in the vehicle with K. PARKER and the driver of the red Ford Edge, K. PARKER provided approximately two pounds of crystal methamphetamine to the CS in exchange for government-furnished funds.  The CS and K. PARKER also discussed drug trafficking schemes during the interaction, to include distributing crystal methamphetamine, heroin, and powder fentanyl.  K. PARKER used slang for the controlled substances, such as "chocolate" and "windshields."  I know, based on my training and experience, that "chocolate" is a reference to heroin, and "windshields" are a reference to crystal methamphetamine.  I believe that K. PARKER preferred to use these pro-words so that his conversations, if overheard, would sound innocuous to anyone listening.  In this way, K. PARKER would be able to discuss the sale of controlled substances without alarming anyone that may overhear his conversations.

88.     K. PARKER also explained to the CS that, "you know, politics with my shit, you know I'm deep."  Based on my training and experience, I believe that "politics" are a reference to internal gang issues, and K. PARKER being "deep" is a reference that K. PARKER is heavily ingrained in these internal gang issues, and indicated that the death of FIELDS was a significant event within the gang because FIELDS was "our golden child."  K. PARKER also explained that he intentionally isolates himself from his customers for protection by stating, "when I'm doing business with people, I don't want to get…your people to get familiar with me because one day you might, a nigga might play you."  Based on my training and experience, I know that the reference to "business" is a reference to engaging in criminal activity such as the illegal

distribution of controlled substances or firearms.  I also know that the reference to "play" is a reference to double-cross or do something to negatively impact K. PARKER or his distribution network or gang.  I believe, based on my training and experience, that K. PARKER was telling the CS that he did not want to develop a close relationship with the people he distributes contraband to, because he knows there is a chance that those people, if they know him well enough, could later compromise his distribution network.

89.     K. PARKER continued to explain his criminal lifestyle, explaining, "The difference with me is nigga I'm the only one in my age group probably still out.  It's probably me and like two other niggas and they doing the same thing."  Based on my training and experience, I believe that K. PARKER was explaining that he was a senior member of the gang, and was one of the oldest people still involved in the lifestyle of selling controlled substances and firearms.  He further emphasized his notoriety by stating, "Niggas doing videos, I'll be on the side…Y'all know I'm from here…Why would I do a video?"  Based on my training and experience, I believe that K. PARKER was explaining that he was so well known within his criminal community, that he did not need to be seen in a music video in order for people to know who he is.

90.     After their conversation and the controlled purchase, the CS departed the area, escorted by law enforcement.  ATF later determined that the purchased drugs weighed approximately 910 grams.  ATF also conducted a field test of the drugs, which resulted in a presumptive positive result for the presence of methamphetamine.

**N.     August 22, 2024 Controlled Purchase of Heroin from K. PARKER**

91.     After the August 20, 2024 controlled purchase, the CS communicated telephonically with K. PARKER.  At the direction of law enforcement, the CS requested to purchase crystal methamphetamine and powder fentanyl from K. PARKER.  K. PARKER instructed the CS to meet at the Willie's Burgers parking lot located at 2415 16th Street, Sacramento, CA to conduct the transaction.

92.     The CS was escorted to the Willie's Burgers parking lot by law enforcement.

Shortly thereafter, K. PARKER arrived in his gray GMC Envoy, CA LP 5CKY379. The CS approached K. PARKER's vehicle and entered the passenger seat. Once inside, K. PARKER provided approximately four ounces of heroin to the CS. When the CS asked about the crystal methamphetamine, K. PARKER explained that one of his "brother-in-laws" had been in possession of the "work," but had been arrested by law enforcement the previous day. Based on my training and experience, I know that gang members refer to other gang and/or DTO members with familial references or inclusive language, such as "brother," "brother-in-law," "blood," and "cousin." I also know that "work" is a slang reference for contraband, such as drugs. I believe that K. PARKER's reference to a "brother-in-law" was a reference to another DTO member who had the drugs, but had been arrested. I also believe that K. PARKER may have been referencing the arrest of Alexis BUSTOS, who was arrested at 1513 Grace Avenue (a source location for methamphetamine from the May 24, 2024 controlled purchase) for violations of 21 U.S.C. § 846 on August 21, 2024.

93.    The CS also asked about powder fentanyl, and K. PARKER replied that he could acquire methamphetamine and powder fentanyl in the future. The CS then departed the area, escorted by law enforcement. Chemists at the DEA lab later confirmed the weight (100 grams) and presence of heroin.

**O.    September 5, 2024 Attempted Controlled Purchase from K. PARKER**

94.    After the August 22, 2024 controlled purchase, the CS communicated telephonically with K. PARKER. At the direction of law enforcement, the CS requested to purchase two pounds of crystal methamphetamine and four ounces of powder fentanyl from K. PARKER. Prior to meeting, K. PARKER instructed the CS to meet at the Safeway parking lot located at 1025 Alhambra Boulevard, Sacramento, CA.

95.    Prior to the transaction, surveillance detectives located K. PARKER's gray GMC Envoy, CA LP 5CKY379, in the vicinity of **TR2**. Law enforcement surveillance K. PARKER as he drove to 6353 Misty Wood Way, Citrus Heights, CA[17] ("**TR4**"). In addition to SURITA's

---

[17] A SMUD law enforcement query identified that the utilities customer for 6353 Misty

paramour listed as the utilities customer for **TR4**, this address is listed on SURITA's CA Driver's License, and is his documented WebKPF address. Shortly after K. PARKER arrived, SURITA's gray Ford Edge, CA LP 9FID963, arrived and parked in the driveway of **TR4**. K. PARKER exited his gray GMC Envoy and entered the passenger seat of SURITA's gray Ford Edge. SURITA's gray Ford Edge then departed the residence.

96.     Detectives surveilled SURITA's Ford Edge, but lost sight of the vehicle in the vicinity of Auburn Boulevard and Devecchi Avenue. Approximately 15 minutes later, detectives observed the Ford Edge traveling away from this same area, and followed it to the Safeway parking lot. Around this time, K. PARKER called the CS and informed the CS that he was "good for the four, not for the two." Based on my training and experience, I believe that the "four" was a reference to the four ounces of powder fentanyl, and the "two" was a reference to the two pounds of methamphetamine. I believe that K. PARKER was explaining to the CS that he would be able to sell the CS four ounces of powder fentanyl, but was unable to acquire the two pounds of methamphetamine.

97.     Law enforcement also escorted the CS to the Safeway parking lot. Once both parties had arrived to the lot, K. PARKER exited the gray Ford Edge and entered the CS's vehicle. K. PARKER sold approximately four ounces of suspected powder fentanyl to the CS. After the transaction, K. PARKER exited the CS's vehicle, and law enforcement escorted the CS away from the area.

98.     Chemists at the DEA lab later tested the suspected fentanyl and determined that the purchased substance weighed 98 grams, but there was no fentanyl detected. At a later point in time, I interviewed an individual identified herein as "Subject 1."[18] Subject 1 told me that

Wood Way is Sarina Razo, who has been the utilities customer since September 2013. As mentioned in Footnote 16, Razo was identified as SURITA's paramour.

[18]

he/she was familiar with the drug trafficking activities of Bogart MERCADO and SURITA, and that around the time of this controlled purchase (early September 2024), MERCADO had provided SURITA with a kilogram of fentanyl. However, according to Subject 1, MERCADO had actually given SURITA a kilogram of "bunk," meaning that it was "sham," or a substance that is made to look and feel like a drug but does not contain a controlled substance. Based on my interview of Subject 1 and the fact that SURITA sold a substance that looked like powder fentanyl but did not test positive for the presence of a controlled substance, I believe that SURITA was in fact K. PARKER's SOS for this September 5, 2024 controlled purchase.

P.    **September 18, 2024 Controlled Purchase of Fentanyl and Methamphetamine from K. PARKER and SURITA**

99.    On September 7, 2024, John Parker Jr., the son of J. PARKER (and nephew of K. PARKER), was shot and killed at 4059 4th Avenue. While currently unresolved, I know that Sacramento Police Department officers believe that the homicide of John Parker Jr. was possibly the result of a gang-related shooting. Specifically, I know that an individual identified by Sacramento Police Department as Trevon Armstrong may have been involved in the conspiracy to shoot John Parker Jr.

100.   After the September 5, 2024 controlled purchase, the CS communicated telephonically with K. PARKER. At the direction of law enforcement, the CS requested to purchase four ounces of powder fentanyl and two pounds of crystal methamphetamine from PARKER on September 18, 2024. Before meeting, K. PARKER instructed the CS to travel to the Chevron parking lot located at 4200 Norwood Avenue, Sacramento, CA to conduct the



transaction.  Law enforcement then escorted the CS to the Chevron.

101.    Law enforcement observed K. PARKER depart the area of 3200 2nd Avenue, Sacramento, CA in a white Mercedes Benz GLE350, bearing CA license plate 8SDA490.[19] Surveillance detectives continued to observe as the white Mercedes Benz CLE350 entered the Chevron gas station, drove around, and then crossed the street to 4211 Norwood Avenue.  K. PARKER called the CS, and told the CS to move across the street to 4211 Norwood Avenue. Based on my training and experience, I know that drug traffickers often change meeting locations at the last minute for a variety of reasons.  One of these reasons is to conduct countersurveillance to identify if any other vehicles follow the customer's vehicle.  This would alert the drug dealer of potential law enforcement compromise.  In this instance, I believe that K. PARKER told the CS to move across the street in order to discern whether or not law enforcement was in the area and following the CS.

102.    When the white Mercedes Benz CLE350 parked, a surveillance detective observed K. PARKER exit the driver's seat without anything in his hands, and then walk away from his vehicle.  The CS then parked in the area, and K. PARKER again instructed the CS to move parking locations.  Once again, based on my training and experience, I believe K. PARKER was attempting to discern if the CS was accompanied by law enforcement.  As the CS was repositioning, a surveillance detective observed K. PARKER exit from the passenger door of a black Lexus sedan, CA LP 9KDH725,[20] carrying a small bag in his hand, and then walked to the CS's vehicle and entered the passenger seat.

103.    Once inside, K. PARKER showed the CS the suspected methamphetamine and fentanyl, and said, "I told him to make it right…I just set there and had a long little talk with

---

[19] The white Mercedes Benz GLE350, CA LP 8SDA490, was registered to Laura Parker at 8805 Elk Grove Boulevard, Suite A, Elk Grove, CA.  I know, based on this investigation, that L. Parker is the paramour of K. PARKER.

[20] A CA DMV query identified that the black Lexus sedan, CA LP 9KDH725, was registered to Lexus of Sacramento at 2600 Fulton Avenue, Sacramento, CA.  I know, based on my training and experience, that those involved in criminal activity drive vehicles that are not registered to their name or address.

him…if it ain't…lookin right bruh, he's like then I'll work with you bruh."  Based on my training and experience, and my knowledge of this investigation, I believe that K. PARKER's references to "he" and "him" are references to K. PARKER's drug SOS, in this instance, SURITA.  I believe that "if it ain't lookin right" is a reference to the sham fentanyl that the CS had purchased during the previous transaction.  And I believe that when K. PARKER's SOS said, "I'll work with you," the SOS was acknowledging that the previously purchased substance was not fentanyl, and that the SOS would attempt to ensure the quality of the drugs in the future to keep the CS happy.  Based on the context of this situation and the reference to the previous deal, I believe that SURITA was the individual in the black Lexus sedan, and had brought the methamphetamine and powder fentanyl to K. PARKER for this sale to the CS.

104.    The CS then provided government-furnished funds to K. PARKER in exchange for the methamphetamine and powder fentanyl.  K. PARKER departed, stating, "Let me get to it and get this nigga his money," and returned to the black Lexus sedan.  Based on my training and experience, I know that drug distributors do not keep the entirety of the funds that they receive from their customers, and instead provide a portion of the funds to their SOS.  In this situation, although the CS paid K. PARKER for the drugs, K. PARKER had to then return to his SOS, SURITA, to provide SURITA with his allocation of the proceeds.

105.    After a few minutes, K. PARKER exited the black Lexus sedan, which departed the area.  Detectives surveilled the black Lexus sedan away until it parked at Thunder Valley Casino, 1200 Athens Avenue, Lincoln, CA.  SURITA exited from the driver's seat of the black Lexus sedan and entered the casino.  His entrance to the casino was captured by a casino security camera:

  

SECURITY CAM      DRIVER'S LICENSE (2024)    BOOKING PHOTO (2017)

106.    Chemists at the DEA lab later confirmed the weight and presence of drugs: 883 grams of methamphetamine and 98 grams of fentanyl.

Q.    **October 11, 2024 Controlled Purchase of Methamphetamine and Firearms from K. PARKER.**

107.    After the September 18, 2024 controlled purchase, the CS communicated telephonically with K. PARKER and asked to buy two pounds of methamphetamine and four firearms from K. PARKER.  Prior to meeting, K. PARKER told the CS that he was going to acquire the firearms, and instructed the CS to go to Brianna's Mexican Food located at 9783 Lincoln Village Drive, Sacramento, CA to conduct the transaction.

108.    Before the CS arrived at the restaurant, a surveillance detective observed K. PARKER's gray GMC Envoy, CA LP 5CKY379, parked in the lot of Brianna's Mexican Food. The CS then arrived, parked, and approached K. PARKER's gray GMC Envoy.  Upon entering the front passenger seat, K. PARKER explained that the firearm SOS was a childhood friend, and that he had negotiated a better deal for the purchase, saving the CS $200.  K. PARKER then explained the specifics of the firearms to the CS, detailing that K. PARKER's SOS had stated that some were machineguns.  I know based on my training and experience that a reference to a machinegun means that the firearm is capable of fully automatic fire.  K. PARKER also stated that his SOS was interested in selling more firearms to the CS.

109.    K. PARKER then provided the CS with a plastic bag which contained the suspected methamphetamine.  The CS paid K. PARKER for the firearms and drugs.  The CS then began transferring the drugs and firearms (which were in a suitcase) to the CS's vehicle, and K. PARKER then conversed with the CS, discussing violence among Oak Park Bloods gang members.

110.    Following the controlled purchase, K. PARKER entered the restaurant and the CS was escorted away from the area by law enforcement.

111.    Chemists at the DEA lab determined that the purchased drugs were 888 grams of methamphetamine.

112.    ATF determined that the purchased firearms were as follows:

a)    A Smith and Wesson, Model 1006, 10mm-caliber pistol with serial number TEU9784

b)    A Diamondback Firearms, LLC Model DB15 5.56x45mm-caliber (AR-15) rifle with serial number DB2445263, which was equipped with a machinegun conversion device allowing automatic fire; and

c)    A Vulcan Model V10-45 .45-caliber (MAC-type) pistol with serial number F11816, which was determined to have a malfunctioning bolt and was incapable of performing a functions test.

**R.    October 29, 2024 Controlled Purchase of a Firearm and Methamphetamine from K. PARKER**

113.    After the October 11, 2024 controlled purchase, the CS communicated telephonically with K. PARKER.  At the direction of law enforcement, the CS requested to purchase methamphetamine and a firearm from K. PARKER.  K. PARKER instructed the CS to meet him at Willie's Burgers parking lot, located at 2415 16th Street, Sacramento, CA to conduct the transaction.  Law enforcement subsequently escorted the CS to Willie's Burgers.

114.    An agent observed K. PARKER's GMC Envoy (CA LP 5CKY379) parked in the vicinity of **TR2** prior to the transaction.  K. PARKER was also observed as he departed from

**TR2**, opened his passenger door and trunk area, and then entered the driver's seat and departed the area.  Shortly thereafter, K. PARKER arrived to Willie's Burgers as the driver and sole occupant of the GMC Envoy.  After parking, K. PARKER advised the CS that he was awaiting the methamphetamine source of supply to arrive.

115.    The CS approached K. PARKER's GMC Envoy and entered the passenger seat.  Once inside, K. PARKER explained to the CS that he was unable to obtain all of the requested firearms.  However, K. PARKER did provide one firearm to the CS, which the CS purchased.  While the CS was with K. PARKER, K. PARKER placed another phone call to a suspected methamphetamine source of supply, who advised that he was en route to the area.

116.    While the CS and K. PARKER were conversing, a gray Toyota Tacoma arrived to Willie's Burgers, and when the CS asked if it was the crystal methamphetamine source of supply, K. PARKER indicated that it was.  The CS then provided K. PARKER with additional government-furnished funds.  K. PARKER exited the GMC Envoy and approached the driver of the gray Toyota Tacoma, who law enforcement later identified based on comparing him/her to his/her CA Driver's License photo, but who is not charged herein.  The driver removed a plastic bag from the passenger compartment of his Toyota Tacoma, and, when K. PARKER approached, handed the bag to K. PARKER in exchange for an unknown amount of currency.  K. PARKER returned to his GMC Envoy with the bag and sold approximately two pounds of methamphetamine to the CS

117.    ATF later determined that the purchased firearm was a Zastava Model PAP M92PV 7.62x39mm caliber (AK-47) pistol with serial number M92PV013887.  Chemists at the DEA lab later tested the purchased drugs and determined them to be 873.9 grams of methamphetamine.

**S.**    **November 12, 2024 Controlled Purchase of two firearms from K. PARKER.**

118.    After the October 29, 2024 controlled purchase, the CS communicated telephonically with K. PARKER.  At the direction of law enforcement, the CS requested to purchase a firearm and a suppressor from K. PARKER.  Prior to meeting, K. PARKER

instructed the CS to travel to Highlands Market parking lot located at 3667 Elkhorn Boulevard, North Highlands, CA to conduct the transaction.

119.    Prior to the CS arriving, an agent observed K. PARKER's GMC Envoy, CA LP 5CKY379, arrive in the Highlands Market parking lot.  After arriving, an unidentified individual exited the passenger seat.  When the CS arrived to the parking lot, escorted by law enforcement, he/she parked next to K. PARKER's GMC Envoy and then entered the passenger seat, while the unidentified individual remained outside.  Once inside, K. PARKER provided a Smith and Wesson revolver to the CS, which the CS had paid for during the October 11, 2024 controlled purchase, which K. PARKER stated was "the old business."  K. PARKER then provided the CS with another firearm, as well a purported suppressor, in exchange for government-furnished funds.

120.    The CS then exited K. PARKER's GMC Envoy, with the firearms and purported suppressor in a bag.  The unidentified individual told the CS, "you're keeping my bag, huh?"  The CS responded that the bag would be returned; however, once the CS returned to the CS's vehicle, the unidentified individual had entered the passenger seat of K. PARKER's GMC Envoy, and both K. PARKER and the unidentified individual departed.

121.    The CS was then escorted away from the area by law enforcement.  ATF later identified that the firearms purchased were a Smith and Wesson .38 Special revolver, with serial number J490320, and a Cobray M-11 9mm pistol with serial number 86-0002908.  A records check of the firearms identified that the Smith and Wesson revolver had an associated DROS from May 21, 1977, to Anselmo Padilla, whose date of birth was listed as December 18, 1943.  There were no associated records for the Cobray M-11 pistol.

122.    An inspection of the purported suppressor identified that it was in fact a barrel extender, and not a suppressor.  At the direction of law enforcement, the CS contacted K. PARKER about the discrepancy, but the issue remained unresolved.

**T.     January 2, 2025 Controlled Purchase of Firearms from R. ESCOBAR and K.**

**PARKER**

123.    On December 28, 2024, K. PARKER's gray GMC Envoy, CA LP 5CKY379, was identified as a suspect vehicle in the shooting of Trevon Armstrong in the vicinity of **TR2** (*reference* Sacramento Police Department Case #24-356453).

124.    After the November 12, 2024 controlled purchase, the CS maintained telephonic communication with K. PARKER.  At the direction of law enforcement, the CS requested to purchase one firearm from K. PARKER.  On January 2, 2025, K. PARKER instructed the CS to meet in the area of 53rd Avenue and Sun River Drive (Danny Nunn Park) in Sacramento, CA to conduct the transaction.  Law enforcement subsequently escorted the CS to Danny Nunn Park.

125.    Surveillance detectives observed two vehicles in the area.  The first was a black Nissan sedan, CA LP 9AKB088[21], and the second was a gray BMW sedan, CA LP 6KMZ069.[22] The gray BMW sedan departed prior to the CS's arrival.

126.    Upon the CS's arrival, K. PARKER exited the driver's seat of the black Nissan sedan, approached the CS's vehicle, and entered the passenger seat.  Once inside the CS's vehicle, K. PARKER talked with the CS, saying, "I got some other shit going on, a little situation."  Based on my knowledge of this investigation, as well as my knowledge of Sacramento Police Department's shooting investigation, I believe that the "little situation" was K. PARKER's involvement in the December 28, 2024 shooting at Armstrong in the vicinity of **TR2**.  K. PARKER continued, "So look, I just, what I had to do, I'm on my way out of here…I gotta get up outta here."  K. PARKER continued, "I put that motherfucker up and all that…the nigga's still, nigga's still, he's still wiggling and maneuvering…I got the hospital floor, I'm

---

[21] A CA DMV query identified that the black Nissan sedan, CA LP 9AKB088, was registered to Portia Parish at 407 Vallejo Way, Sacramento, CA.  I know, based on my training and experience, that individuals involved in criminal activity drive vehicles that are not registered in their name or to their address in order to avoid detection by law enforcement.

[22] A CAM DMV query identified that the gray BMW sedan, CA LP 6KMZ069, was registered to Kevin CuervoPalacios at 7333 Topanga Lane #29, Sacramento, CA.  I know, based on my training and experience, that individuals involved in criminal activity drive vehicles that are not registered in their name or to their address in order to avoid detection by law enforcement.

about to know when he's getting released."

127.    The CS later attempted to confirm whether or not Armstrong would have known that it was K. PARKER specifically that had been involved in shooting at Armstrong. K. PARKER replied, "We all from the same place…It's been back and forth."

128.    The CS attempted to confirm whether or not K. PARKER specifically shot at Armstrong by asking if K. PARKER had anyone else that he could say was in the car and could have been the shooter instead.  K. PARKER replied, "I don't, I don't, I don't."  K. PARKER explained that "if it's a problem I see like I'm smack I don't care about these cameras, none of that.  It is going down because I got too much."  Based on my training and experience, I believe that K. PARKER was explaining that when he is confronted with a "problem" such as an enemy, he is willing to resort to deadly violence.  By stating, "I don't care about these cameras," K. PARKER was explaining that he did not care if he was caught on camera when shooting. Furthermore, K. PARKER stating that "it's going down because I got too much," was K. PARKER's explanation that he was willing to resort to deadly violence against another person.

129.    At approximately this point in the conversation, the gray BMW sedan, CA LP 6KMZ069, returned to the area and the driver, later identified as Raymundo ESCOBAR (by comparing images from the covert recording to his CA driver's license photo), met with K. PARKER, who exited the CS's vehicle and returned to his black Nissan sedan.  After a brief period, K. PARKER and R. ESCOBAR, carrying a blue duffle bag, approached the CS's vehicle and entered.

130.    Once inside the CS's vehicle, R. ESCOBAR produced a privately manufactured AR-15 style pistol, 7.62X39 caliber, bearing no serial number from the duffle bag and a Smith and Wesson MP 40 Shield, .40 caliber, bearing serial number JMW5768, from his waistband:

  

K. PARKER (L) AND R. ESCOBAR (R)   R. ESCOBAR W/ PMF AR-15   R. ESCOBAR CA DMV PHOTO

131.     Prior to, and during the transaction, K. PARKER was sitting in the front passenger seat of the UCV and coordinated the firearm transaction between R. ESOCBAR and the CS.  The CS provided government-furnished funds to R. ESCOBAR as payment for the firearms.  While conversing, the CS asked about the availability of crystal methamphetamine.  K. PARKER replied, "I'm going to holler about that literally right now with him," and motioned in R. ESCOBAR's direction.  Based on my training and experience and my understanding of this investigation, I believe when K. PARKER said that he was going to "holler" with R. ESCOBAR, K. PARKER was indicating that R. ESCOBAR was K. PARKER's avenue to a methamphetamine source of supply.  R. ESCOBAR later told the CS, "We're running across them lately, so I'll hit bro and we'll get locked in."  Based on my training and experience, and the context of the conversation, which included both drugs and firearms, I believe that the reference to "them" was a reference to contraband (either firearms or drugs), and that "we'll get locked in" was R. ESCOBAR referencing that he would conduct future deals with the CS.

132.     K. PARKER and R. ESCOBAR then departed, and law enforcement escorted the CS away from the area.

133.     The Smith and Wesson was found to contain a magazine loaded with seven rounds of ammunition.  On January 7, 2025, ATF conducted a records check of the Smith and Wesson MP 40 Shield, .40 caliber, bearing serial number JMW5768 and found that the firearm

had been reported as stolen during a commercial burglary at a firearms business named Al & Bob's Sports located in Grand Rapids, Michigan, on February 23, 2022 (Kent County Sheriff's Department Report #22-108880).

U.    **January 7, 2025 Controlled Purchase of Methamphetamine from K. PARKER, M. ESCOBAR, and R. ESCOBAR (*Count Four, as to M. ESCOBAR*)**

134.    After the controlled purchase on January 2, 2025, the CS maintained telephonic communication with K. PARKER.  At the direction of law enforcement, the CS requested to purchase additional firearms and crystal methamphetamine from K. PARKER.  K. PARKER agreed and instructed the CS to meet on January 7, 2025 at the same location as the January 2, 2025 controlled purchase (Danny Nunn Park, 53rd Avenue and Sun River Drive in Sacramento, CA).  Law enforcement then escorted the CS to the meeting location.

135.    At approximately 3:30 p.m., law enforcement observed K. PARKER arrive at 6413 Sun River Drive, Sacramento, CA[23] (**Target Residence 3**).  There, an individual later identified as Marcelino ESCOBAR (believed to be the brother of R. ESCOBAR) exited the residence with a bag and entered the passenger seat of K. PARKER's black Nissan sedan.  K. PARKER and M. ESCOBAR then drove to the meeting location.  Upon arrival, K. PARKER approached and entered the CS vehicle's front passenger seat.  Shortly thereafter, M. ESCOBAR approached and entered the rear passenger seat and produced multiple firearms.  The CS provided government-furnished funds in exchange for the firearms.

136.    During the meeting, K. PARKER explained that the crystal methamphetamine which the CS had ordered was not available.  However, K. PARKER indicated that he was planning on leaving town (as he had similarly indicated during the January 2, 2025 controlled purchase), and brokered an introduction between the CS and M. ESCOBAR.  The CS and Marcelino Escobar exchanged phone numbers, and then K. PARKER and M. ESCOBAR departed.  Law enforcement escorted the CS away from the area and recovered the firearms.

---

[23] A SMUD law enforcement query identified that the utilities customer for **TR3** is Mauricio Alberto Escobar, phone number 916-709-6120.  SMUD noted that Mauricio had been the listed utilities customer since 2013.

137.    PARKER and M. ESCOBAR were surveilled returning to the black Nissan sedan and driving a circuitous route back to **TR3**, where M. ESCOBAR exited the vehicle.  Based on my training and experience, the route that K. PARKER and M. ESCOBAR took to drive back to **TR3** was counterintuitive.  I know, based on my training and experience, that after conducting an illegal transaction, drug and firearm dealers often embark on circuitous routes in order to detect law enforcement presence.  In this instance, I believe that K. PARKER decided to drive in a circuitous pattern in order to determine if he was being followed by law enforcement.

138.    Later that day, K. PARKER's vehicle was stopped by Sacramento Police Department, and K. PARKER was arrested as a suspect in an attempted homicide (Sacramento Police Department Case #24-356453).  K. PARKER remains in custody at the Sacramento County Jail.

139.    Later that day, the CS and M. ESCOBAR communicated telephonically.  M. ESCOBAR told the CS that the CS's requested crystal methamphetamine would be available in the near future, and, at the direction of law enforcement, the CS agreed to buy the drugs.

140.    Prior to meeting, M. ESCOBAR communicated telephonically with the CS and told the CS that K. PARKER had recently been stopped by law enforcement.  M. ESCOBAR explained that he did not want to meet in the same location, and instead instructed the CS to meet at the Food Co. parking lot located at 8122 Gerber Road, Sacramento, CA to conduct the transaction.  Law enforcement then escorted the CS to that meeting location.

141.    Upon the CS's arrival to the Food Co. parking lot, surveillance detectives observed R. ESCOBAR exit from the driver's seat of a blue Nissan, and walk to the gray BMW sedan, CA LP 6KMZ069, where he received a bag from the driver.  R. ESCOBAR then approached the CS's vehicle and entered the passenger seat.

142.    Once inside the CS's vehicle, R. ESCOBAR provided the CS with approximately five pounds of crystal methamphetamine in exchange for government-furnished funds.  R. ESCOBAR then exited the CS's vehicle and returned to the passenger seat of the gray BMW sedan.  After a brief period, the unidentified driver of the gray BMW sedan exited the driver's

seat and walked to the blue Nissan, while R. ESCOBAR moved from the passenger seat of the gray BMW sedan to the driver's seat.  R. ESCOBAR then departed the parking lot as the driver of the gray BMW sedan.

143.    Law enforcement escorted the CS away from the area and recovered the suspected methamphetamine.

144.    Based on the forgoing controlled purchase, detectives coordinated a traffic stop of the gray BMW sedan and detained R. ESCOBAR.  Inside the gray BMW sedan was a portion of the government-furnished funds that the CS had provided as payment for the suspected methamphetamine.  R. ESCOBAR was arrested and transported to Sacramento County Jail.  R. ESCOBAR was charged by Criminal Complaint and subsequently indicted in 2:25-cr-00015-TLN with distribution of at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

145.    On January 8, 2025, law enforcement conducted a field test of the purchased drugs.  The field test produced a presumptive positive result for the presence of amphetamines. Based on my training and experience, the clear/white color, and the shard-like texture of the drugs, I believe the suspected methamphetamine is consistent in appearance with crystal methamphetamine.

## V.    **Additional Investigation of the Target Subjects**

146.    Following the arrests of K. PARKER and R. ESCOBAR in January 2025, I checked cell phone provider information records for **TT3** and confirmed that **TT3**, which is subscribed to M. ESCOBAR, is still in use despite the arrests of M. ESCOBAR's associates.

147.    On January 22, 2025, the CS called BROOKS at **TT1**.  During their conversation, the CS asked to meet BROOKS and indicated an interest in purchasing contraband.  BROOKS indicated that she was still located at **TR1**, and that the CS could come to **TR1** in order to purchase contraband.  I checked subscriber information for **TT1** in December 2024 and confirmed that it was still subscribed to BROOKS at **TR1**.  I queried commercial and law enforcement databases in January 2025, and these databases indicate that **TR1** is still

BROOKS's address.

148.    Between May 2024 and January 2025, law enforcement observed FIELDS and K. PARKER access **TR2** before and/or after multiple controlled purchases, as described above. Further, I analyzed the toll frequency between K. PARKER and Maurice COLLINS, the SMUD customer for **TR2**, and have identified that they maintain almost daily toll contact with one another.  Additionally, pursuant to a court-authorized GPS tracking warrant for K. PARKER's GMC Envoy issued in E.D. Cal. Case No. 2:24-sw-0812-AC, law enforcement collected K. PARKER's vehicle tracking information in the fall of 2024.  I analyzed the data collected and learned that over a period of approximately 43 days from August 22, 2024, to October 3, 2024, K. PARKER's GMC Envoy stopped at **TR2** approximately 57 times.

149.    Additionally, while conducting surveillance on January 7, 2025, I observed K. PARKER exiting **TR2** immediately prior to the controlled purchase of firearms and planned purchase of methamphetamine described herein.  Thus, while K. PARKER is in custody pending state charges, there is probable cause to believe that **TR2** contains evidence of his drug trafficking activities in violation of 21 U.S.C. §§ 846, 841(a)(1).  K. PARKER and his associates used **TR2** as a stash house and point location as detailed herein.

## IV.    INFORMATION ON CELLULAR DEVICES

150.    Through my training and experience, I know that Verizon, T-Mobile, and AT&T are cellular telephone service providers.  I also know that cellular telephone service providers have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records.

a)      E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

b)      Cell-site data identifies the "cell towers" (i.e., antenna towers covering

specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

151.    Through my training and experience, I know that Verizon, T-Mobile, and AT&T can collect E-911 Phase II data about the location of the **Target Telephones**, including by initiating a signal to determine the location of the **Target Telephones** on Verizon, T-Mobile, and AT&T's network or with such other reference points as may be reasonably available.

152.    Through my training and experience, I know that Verizon, T-Mobile, and AT&T can collect cell-site data about the **Target Telephones**. Further, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Verizon, T-Mobile, and AT&T typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## V.    TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING AND DRUG TRAFFICKERS

153.    As a DEA SA, I have participated in numerous investigations involving the use of federal and state search warrants to collect evidence, including controlled substances and narcotics-related records, and other types of evidence that document the activities of criminal organizations in the manufacturing, trafficking, and distribution of controlled substances. To successfully conduct these investigations, I have utilized a variety of investigative techniques

and resources including physical and electronic surveillance, undercover agent and confidential source infiltration, pen register and trap and trace devices, GPS and telephone tracking devices, trash pulls, pole cameras, stationary video recording vehicles, audio recording devices, and video recording devices.  Through these investigations, my training and experience, conversations with other law enforcement personnel, and debriefings of confidential sources and cooperating defendants, I have become familiar with the methods used by organized criminal enterprises, drug trafficking organizations ("DTOs"), and criminal street gangs to smuggle and safeguard controlled substances and weapons, to manufacture, transport, and distribute contraband, and to collect and launder related proceeds.  Through these investigations I have become familiar with the means in which illegal users of drugs and persons prohibited from possessing firearms receive and/or obtain firearms.  I have also become familiar with the means in which drug traffickers obtain and distribute drugs.  While conducting investigations, I have observed illegal firearm transfers and drug distribution.  Through my training and experience, I am familiar with the modus operandi of individuals illegally trafficking firearms and drugs.

154.    I am familiar with the manner in which methamphetamine, fentanyl, marijuana, heroin, cocaine, and other drugs are manufactured, transported, stored, and distributed; the methods of payment for such drugs; the methods of laundering and concealing drug proceeds; and the methods of communication between drug traffickers.  I have also become familiar with methods and practices used to re-supply and distribute controlled substances as well as the practices used to communicate between co-conspirators.

155.    I know through my training and experience that drug dealers often use a "stash house" (a location typically not associated with their primary residence) to store and move their narcotics through so as to keep their primary residence concealed.  I know that one of the ways to link a drug dealer to their stash house is through the use of cellular technology.  I know that drug dealers have to communicate with each other and when they do, they will often use a cellular telephone.

156.    Based on my training and experience, through discussions with experienced drug

investigators and through the information I have learned through investigations, I know that most drug distributing operations are generally conducted in a similar manner. Narcotics distributing operations require: (1) a source or multiple sources to obtain the drugs; (2) logistical support for trafficking the drugs; (3) financial support for the operation to provide payment to sources, couriers, shippers; and (4) methods to receive payments from clients and conceal the proceeds.

157. Through my training and experience, I have learned the primary method used for communication to facilitate such crimes is by cellular telephone, smartphone, social media, and numerous other messaging-based applications which offer various methods of communication. Some of these applications can send and receive private text-based messages, which provides some protection for the drug trafficker as the message-based service may not be particularly linked to a phone number or to a physical phone. Additionally, I know that drug traffickers use multiple telephones to facilitate the different aspects of negotiations and coordination of drug trafficking.

158. I know that drug distributors often use the same phone to communicate with their customers, particularly when they establish a connection with a repeat customer. When using cell phones to text or call regarding drug distribution, drug traffickers often use slang terms or common nouns in place of the name of the controlled substance or quantity in order to avoid detection by law enforcement. Additionally, drug traffickers predominantly use telephones numbers not subscribed to their names or to their familial residences to create a layer of protection from being detected by law enforcement. Drug traffickers sometimes use multiple telephones or phone numbers, for example, they may maintain one phone (or phone number) for personal or family matters, another phone (or phone number) for trusted DTO members, and even another phone (or phone number) for downstream drug customers.

159. Through my training and experience, conversations with other law enforcement personnel, and debriefings of confidential informants and cooperating defendants, I have become familiar with slang words, phrases, and colloquialisms as they pertain to the concealment of conversations regarding contraband, such as trafficking drugs and firearms, as well as discussing

related proceeds.  I am also familiar with the informal language surrounding gang culture and how gang members may converse with one another using pro-words and phrases.  Thus, I know that, in the appropriate context, conversations, whether about gang relationships, or about the manufacturing, transporting, distributing, or paying for drugs or firearms, may appear to be innocuous despite being conversations about conducting illegal activities.

160.    As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators.  These records may be kept on paper or contained in memory calculators, computers, or cell phones.  It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control.  It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live.  It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.

161.    From my training and experience, I know that individuals involved in drug trafficking frequently store their drugs, drug proceeds, and other contraband in rooms and areas of their residences that appear to belong to other occupants, including, for example, bedrooms belonging to children or other family members, in an effort to conceal the evidence from law enforcement and to disguise their ownership and control of the contraband in the event that it is seized.  When executing a search warrant for a premises inhabited by multiple occupants, only some of whom are targets of the investigation, it is my practice, and the practice of other agents and officers who will be executing the proposed search warrant, to conduct a more cursory search of areas that appear to be under the control of non-targets of the investigation.  We focus our search on the areas under the control of the target(s), common areas, and areas where there is reason to believe, based on the totality of the circumstances and our training and experience, that the target(s) may be concealing contraband or other evidence described in Attachment B-1.  If

46

there is no reason to believe an area of the target premises may contain such evidence or contraband, we conduct a protective sweep for officer safety reasons but do not search the area.

162.    Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them.  Typically, traffickers keep records of those registrations and transactions in their residence.

163.    I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business.  It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

164.    In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons.  Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds. Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

165.    In my experience, traffickers commonly have in their possession (that is, on their person, at their residences, in their vehicles, and in the areas under their control and which they

have free and ready access to) drugs—including, but not limited to, in this case, powder fentanyl, crystal methamphetamine, and counterfeit M-30 pills—which they intend to distribute.  It is my experience that these drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

166.    In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product.  Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

167.    In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and used in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

168.    In my experience, drug traffickers often use vehicles to transport and distribute controlled substances to facilitate their trafficking activities.  It has also been my experience that traffickers will also use vehicles as locations in which to store controlled substances prior to distribution.  During prior investigations, I have observed that drug traffickers will often use vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

169.    In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

170.    In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically.  As a result of that travel, records are generated reflecting travel by commercial and private aircraft, commercial ocean and private vessels as well as common carrier(s).

171.    It has been my experience in the past, and particularly in this case, that when suspects use mobile telephones to communicate with cooperating individuals or undercover agents to set up the drug deals, records relating to these activities will be found stored in the cellular telephone.

172.    I know that narcotics traffickers use mobile telephones to communicate with one another, either by app, voice or text message. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

173.    In this specific case, during each aforementioned controlled purchase conducted

by the CS, the CS communicated with a DTO member utilizing a cell phone. During the course of this investigation, law enforcement agents have also identified multiple phone numbers used by various co-conspirators, including, but not limited to, FIELDS, J. PARKER, K. PARKER, BROOKS, and M. ESCOBAR. Based on my training and experience, it is common for drug traffickers to use apps, calls and text messages to communicate and facilitate narcotic transactions. Furthermore, I know that drug traffickers will use apps such as Instagram, and features such as FaceTime, in order to communicate with others involved in his drug trafficking operations. Therefore, agents are seeking to seize any potential cell phones that could have been utilized by DTO members to facilitate their drug trafficking activities.

174.     As described above and in **Attachments A-1 through A-3**, this affidavit seeks permission to search and seize things that are related to drug and firearms distribution, in whatever form such things are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

175.     It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in **Attachment B-1** are items most often associated with the distribution of controlled substances, including drugs, firearms, and the proceeds from such illegal operations.

176.     The facts set forth in this affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation. This affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations. Based on my experience and training, and after consulting with other law enforcement officers

experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in **Attachment B-1**. Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.  Therefore, I am requesting authority to seize all the items listed in **Attachment B-1** to this affidavit and incorporated here by reference.

## VI.    CONCLUSION AND AUTHORIZATION REQUESTS

177.    Based on the foregoing, I request that the Court issue arrest warrants and a Criminal Complaint charging the following people with the following crimes:

a)    Kevin PARKER and Xavier SURITA with distribution of at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, on or about September 18, 2024, in violation of 21 U.S.C. § 841(a)(1) (Count One);

b)    John PARKER with distribution of at least 40 grams of a mixture and substance containing a detectable amount of fentanyl, on or about March 8, 2024 (Count Two);

c)    Veronica BROOKS with distribution of at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, or about August 1, 2024, in violation of 21 U.S.C. § 841(a)(1) (Count Three);

d)    Marcelino ESCOBAR with conspiring to distribute and possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, on or about January 7, 2025, in violation of 21 U.S.C. §§ 846, 841(a)(1) (Count Four); and

e)    Devon NELSON with distribution of at least 400 grams of fentanyl, on or about June 12, 2024, in violation of 21 U.S.C. § 841(a)(1) (Count Five).

178.    I further request that the Court issue search warrants for the residential properties further described in **Attachments A-1** through **A-3**, for evidence of drug trafficking, in violation of 21 U.S.C. §§ 846, 841(a)(1), as further described in **Attachment B-1**:

a)      BROOKS' current residence, located at 4009 33rd St, Sacramento, CA (**Target Residence 1**);

b)      A drug stash house, located at 3078 MLK Jr. Blvd, Sacramento, CA (**Target Residence 2**); and

c)      M. ESCOBAR's current residence, located at 6413 Sun River Drive, Sacramento, CA (**Target Residence 3**).

179.    I further request that the Court issue a warrant to search SURITA's residence, located at 6353 Misty Wood Way, Citrus Heights, CA (**Target Residence 4**), for the purpose of executing the arrest warrant for SURITA.  **TR4** is further described in **Attachment A-4**.

180.    I further request that the Court issue search warrants under Federal Rule of Criminal Procedure 41(c)(1) and (4) and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephones assigned call numbers (916) 533-6257 (**TT1**), subscribed to BROOKS; and (916) 914-3215 (**TT3**), subscribed to M. ESCOBAR.  **TT1** is serviced by AT&T, a wireless telephone service provider headquartered at 11760 US HWY 1, Suite 300, North Palm Beach, FL 33408. **TT3** is serviced by T-Mobile, a wireless telephone service provider headquartered at 4 Silvan Way, Parsippany, NJ 07054. **TT1** and **TT3** are described in **Attachment A-5** and **A-7**, respectively, and the location information to be seized is described herein and in **Attachment B-3**.  There is probable cause to believe that the information sought by the requested warrants for **TT1** and **TT3** will lead to evidence of violations of 21 U.S.C. §§ 846, 841(a)(1) and the location of a person to be arrested on this Criminal Complaint and requested arrest warrants.

181.    I further request that the Court issue a search warrant under Federal Rule of Criminal Procedure 41(c)(4) and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (916) 666-2278 (**TT2**), used by SURITA.  **TT2's** service provider is Verizon, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.  **TT2** is described in **Attachment A-6**, and the location information to be seized is described herein and in **Attachment B-3**.  There is probable

cause to believe that the information sought by the requested warrant for **TT2** will lead to the location of a person to be arrested (SURITA) on the arrest warrant requested with this application for Criminal Complaint.

182.    I further request that the Court direct Verizon, T-Mobile, and AT&T to disclose to the government any information described in **Attachment B-3** that is within the possession, custody, or control of Verizon, T-Mobile, and AT&T.  I also request that the Court direct Verizon, T-Mobile, and AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in **Attachment B-3** unobtrusively and with a minimum of interference with Verizon, T-Mobile, and AT&T's services, including by initiating a signal to determine the location of the **Target Telephones** on Verizon, T-Mobile, and AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate Verizon, T-Mobile, and AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

183.    I further request that the Court authorize execution of the ping search warrants at any time of day or night, owing to the potential need to locate the **Target Telephones** outside of daytime hours.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

184.    I further request that the Court order that all papers in support of this application, including the affidavit, Criminal Complaint, attachments, and search warrants, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

/s/
_____
Thomas Wiebold
DEA Special Agent

Subscribed to me and sworn telephonically on:    January 24, 2025

Honorable Carolyn K. Delaney
UNITED STATES MAGISTRATE JUDGE

/s/ *Emily G. Sauvageau*
_____
Approved as to form by AUSA EMILY G. SAUVAGEAU

In addition, to ensure technical compliance with 18 U.S.C. §§ 3121-3127, I also request that this warrant shall also function as a pen register order.  I thus certify that the information, under oath, that likely to be obtained is relevant to an ongoing criminal investigation conducted by the Drug Enforcement Administration, based on the agent's affidavit herein. *See* 18 U.S.C. §§ 3122(b), 3123(b).

## ATTACHMENT A-1

A.     The property to be searched is 4009 33rd Street, Sacramento, CA. 4009 33rd Street is further described as a single-family residence is located on the east side of 33rd Street. The residence has a tan exterior with white trim. The numbers "4009" in black lettering are located to the left of the front door/entryway. A photo of the premises to be searched is below:



B.     The person of Veronica BROOKS, DOB: XX-XX-1982;

C.     Sheds or outbuildings within the curtilage of the property;

D.     The cellular telephone assigned call number (916) 533-6257 (**Target Telephone 1**), subscribed to BROOKS.

## ATTACHMENT A-2

A.      The property to be searched is 3078 Martin Luther King Jr. Boulevard, Sacramento, CA, further described as a single-family residence on the corner of Martin Luther King Jr. Boulevard and 6th Avenue, Sacramento, CA.  The residence has a light beige stucco exterior with brown trim, and the curtilage is enclosed by a black metal fence with attached privacy screening.  The front door is dark, and is covered by a black security door.  The numbers "3078" are painted in black on the wall to the right of the front door.  Photos of the premises to be searched are below:



SOUTH SIDE



EAST SIDE

B.      ███████████████████████

C.      Sheds and outbuildings within the curtilage of the property;

## ATTACHMENT A-3

A.      The property to be searched is **Target Residence 3**, 6413 Sun River Drive, Sacramento, CA, further described as a single-family residence located on the southwest corner of Sun River Drive and 48th Avenue.  The residence has a light tan exterior and with white trim.  The curtilage is enclosed by wooden privacy fencing and white metal fencing, with a metal vehicular gate.  No discernable labeling of "6413" can be readily observed from outside the residence; however, commercial mapping software (Google Maps, etc.) identifies 6413 Sun River Drive as the sole address located on the southwest corner of Sun River Drive and 48th Avenue.  Below is a photo of **Target Residence 3** and a Google Maps screenshot of the location:

 

B.      The person of Marcelino ESCOBAR, DOB: XX-XX-2001;

C.      Sheds and outbuildings within the curtilage of the property;

D.      The cell phone associated with call number (916) 914-3215 (**Target Telephone 3**), subscribed to M. ESCOBAR;

E.      Gray BMW sedan, bearing CA license plate 6KMZ069.

**ATTACHMENT A-4**

The property to be searched is 6353 Misty Wood Way, Citrus Heights, CA, further described as a single-family residence located on the north side of Misty Wood Way.  The residence has a light tan stucco and wood panel exterior with white trim.  The number "6353" in black lettering is located on a pillar to the left of the entryway.  A photo of the premises is below:



The location to be searched includes any sheds and outbuildings within the curtilage of the property in which SURITA could reasonably be located.

## ATTACHMENT A-5

### Property to Be Searched

1. The cellular telephone assigned call number (916) 604-1286 ("Target Telephone 1," or "TT1"); (916) 533-6257, (916) 533-7619, (916) 666-2278, (916) 559-0388 , (916) 534-5922, (916) 698-2112, (916) 759-1086, and (916) 544-7840 (**Target Telephone 1**), whose wireless service provider is Verizon, T-Mobile, and AT&T, a company headquartered at 11760 US HWY 1, Suite 300, North Palm Beach, FL 33408.

2. Records and information associated with the Target Telephone that is within the possession, custody, or control of Verizon, T-Mobile, and AT&T.

**ATTACHMENT A-6**

**Property to Be Searched**

1. The cellular telephone assigned call number (916) 604-1286 ("Target Telephone 1," or "TT1"); (916) 533-6257, (916) 533-7619, (916) 666-2278, (916) 559-0388 , (916) 534-5922, (916) 698-2112, (916) 759-1086, and (916) 544-7840 (**Target Telephone 2**), whose wireless service provider is Verizon, T-Mobile, and AT&T, a company headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.

2. Records and information associated with the Target Telephone that is within the possession, custody, or control of Verizon, T-Mobile, and AT&T.

# **ATTACHMENT A-7**

## **Property to Be Searched**

1. The cellular telephone assigned call number (916) 604-1286 ("Target Telephone 1," or "TT1"); (916) 533-6257, (916) 533-7619, (916) 666-2278, (916) 559-0388 , (916) 534-5922, (916) 698-2112, (916) 759-1086, and (916) 544-7840 (**Target Telephone 3**), whose wireless service provider is Verizon, T-Mobile, and AT&T, a company headquartered at 4 Silvan Way, Parsippany, NJ 07054.

2. Records and information associated with the Target Telephone that is within the possession, custody, or control of Verizon, T-Mobile, and AT&T.

## ATTACHMENT B-1

1.        All records relating to violations of 21 U.S.C. §§ 846, 841(a)(1) (conspiracy, distribution, and possession with intent to distribute controlled substances) involving the Target Subjects, occurring after November 2023 and through the present, including:

     a.  Controlled substances, or items frequently used to distribute controlled substances, or items containing residue from the distribution of controlled substances; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including glass vials (including dropper vials), alcohol and solvents, plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

     b.  United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase controlled substances, during in this investigation;

     c.  Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

     d.  Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances;

     e.  Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

     f.  Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

g.  Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

h.  Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

i.  Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

j.  Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person;

k.  Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

2.  As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Attachments

3.       This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant for the particular cell phone identified in **Attachment A-1**. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.  Other than the phone identified in **Attachment A-1**, law enforcement may seize cell phones located in **Target Residence 1** according to this warrant and apply for further authorization to search any such phones.

Attachments

## ATTACHMENT B-2

1.      All records relating to violations of 21 U.S.C. §§ 846, 841(a)(1) (conspiracy, distribution, and possession with intent to distribute controlled substances) and 18 U.S.C. § 922(a)(1)(A) (dealing in firearms without a license) involving the Target Subjects, occurring after November 2023 and through the present, including:

      a.  Controlled substances, or items frequently used to distribute controlled substances, or items containing residue from the distribution of controlled substances; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including glass vials (including dropper vials), alcohol and solvents, plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

      b.  United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase controlled substances, during in this investigation;

      c.  Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

      d.  Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances;

      e.  Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

      f.  Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone

numbers, communications, and illegal activities of associates in drug trafficking activities;

g.  Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

h.  Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

i.  Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

j.  Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person;

k.  Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

l.  Any and all firearms or ammunition.

m.  Any firearm parts or accessories.

n.  Any items pertaining to the possession, manufacture, or distribution of firearms.

o.  Records relating to the acquisition, disposition, and importation of firearms, including but not limited to communications with vendors, packaging, shipping labels, order history, payment history, shipping confirmations, and stored payment methods.

p.  Indicia of occupancy, residency, and/or ownership of the items noted above and of the premises, including but not limited to, papers, correspondence, canceled envelopes, canceled postcards, bills, and registration documents, whether such documents are stored in documentary or electronic form.

Attachments

q.  Any safes, locked cabinets, and/or other secured containers and/or devices at the locations identified in **Attachments A-2 and A-3**.  Law enforcement shall be permitted to open such locked containers by force or through the use of a locksmith if necessary.

2.      As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

3.      This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant for the particular cell phone identified in **Attachment A-3**. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.  Other than the phone identified in **Attachment A-3**, law enforcement may seize cell phones located in the **Target Residences** according to this warrant and apply for further authorization to search any such phones.

Attachments

**ATTACHMENT B-3**

**Particular Things to be Seized**

I.    **Information to be Disclosed by the Provider**

All information about the location of the Target Telephone described in Attachment A-5 through A-7 for a period of thirty days, during all times of day and night. "Information about the location of the Target Telephone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A-5 through A-7.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon, T-Mobile, and AT&T, Verizon, T-Mobile, and AT&T is required to disclose the Location Information to the government. In addition, Verizon, T-Mobile, and AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon, T-Mobile, and AT&T's services, including by initiating a signal to determine the location of the Target Telephone on Verizon, T-Mobile, and AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Verizon, T-Mobile, and AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

II.    **Information to Be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §§ 846, 841(a)(1) involving BROOKS, and/or M. ESCOBAR, and all information described in Section I that will assist in arresting BROOKS, SURITA, and M. ESCOBAR, who are charged with violating 21 U.S.C. § 841(a)(1), are the subject of an arrest warrant issued on January 24, 2025, and are each a

"person to be arrested" within the meaning of FRCP 41(c)(4).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.